No. 83-269

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

STATE OF MONTANA,

            Plaintiff and Respondent,

    -vs-

JACKSON MONTGOMERY SMITH,

            Defendant and Appellant.

APPEAL FROM: District Court of the Fourteenth Judicial District,
             In and for the County of Musselshell,
             The Honorable Nat Allen, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Torger S. Oaas, Lewistown, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena,
        Montana
        John Pratt, County Attorney, Roundup, Montana

                        Submitted on Briefs: October 19, 1983

                                    Decided: January 26, 1984

Filed: JAN 26 1984

*Ethel M. Harrison*

———————————————————
            Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Defendant, Jackson M. Smith, appeals from a Musselshell County District Court judgment entered on a jury verdict finding him guilty of sexual intercourse without consent and aggravated assault. Both charges stem from an incident near Roundup, Montana, between defendant and his ten-year-old stepdaughter. Defendant was sentenced to ten years imprisonment on each count, five years suspended, terms to be served consecutively.

Defendant raises three issues. The first two issues relate to the trial court's preliminary questioning of the ten-year-old girl in the presence of the jury to determine whether she was qualified to testify--that is, whether she could understand the importance of taking an oath. Although defendant did not object at trial, defendant first contends that the trial court impermissibly commented on the credibility of the witness by the manner in which he asked questions. Second, because he did not object to the questioning, and because he recognizes that the State claims waiver by this failure to object, defendant contends that the issue is so important that this Court must grant a new trial in any event based on the "plain error doctrine." And third, defendant claims the trial court improperly refused his motion to continue the trial once it granted the State's motion to add one witness five days before trial and three witnesses on the first day of trial. We affirm.

The tragic nature of this case is illustrated by the facts and circumstances leading to the whirlwind marriage of the defendant and the girl's mother and the ultimate assault on the young girl. Defendant is a sixty-year-old man who

- 2 -

first became acquainted with the girl's mother when he read an advertisement she had placed in a magazine describing the type of man she wanted for a husband. At the time, defendant was living near Roundup, Montana, and she was living in Clarkston, Washington, with her three children, ages ten, seven, and six. Despite a disparity in ages of nearly 30 years, the defendant and the victim's mother corresponded by mail for approximately eight months before the woman came to Montana to meet defendant for the first time in April 1982. After a week's stay, the woman returned to Washington to get the children and close her affairs there, and then returned to Montana on May 4, 1982. She and the defendant were married in Cody, Wyoming, the following day.

After the marriage, defendant and his new wife, together with her three children, lived in defendant's house located approximately 11 miles from Roundup. The house had no electrical lighting in the bedrooms and no indoor plumbing. The family lived together in the house from May 1982 until the incident in question occurred on July 30, 1982.

On July 30, 1982, the mother and children had gone into town (Roundup) to buy groceries and beer, and to run various errands. Defendant had gone into town as well but had driven a separate vehicle. They all returned from town at approximately the same time. The girl and her mother decided they wanted to shoot at empty cans with defendant's .22 caliber rifle, and made their way up a nearby hill to a place where they regularly practiced shooting. Defendant became angry, however, and jerked the gun away from his wife and took it with him into the house. Defendant was the only person who had control of the gun the rest of the day on July 30, 1982.

Defendant began drinking early the evening of July 30, 1982, and continued to drink steadily until he ate dinner at approximately 10:00 p.m. At this time, the children's mother laid out the children's nightclothes and sent them to bed. At the time the girl retired she had on underwear, a night gown, and a robe. The girl slept on the top bunk of the bunkbed which she shared with her younger sister. The house has three bedrooms, the girl's room being the middle room between her mother's and brother's rooms. Defendant and the children's mother retired at around 10:30 or 11:00 p.m.

Sometime later, the girl heard someone walking around, propped herself up on one elbow and noticed the defendant entering her room. The yard light shone through the bedroom window and the girl could see the defendant was naked and was carrying the .22 rifle. The defendant commanded the victim to "take off all (her) clothes, or (he would) shoot." The girl refused and defendant persisted, ultimately yanking the girl's panties off of her. Defendant then masturbated into the girl's panties and tossed them onto the top of the dresser. Defendant proceeded to spread the girl's legs apart and penetrated her vagina with his finger, causing the girl to scream in pain. Defendant told her to "shut up or (he would) shoot," and when she did not, he fired the rifle over her head as she ducked. The bullet went through the bedroom wall. The mother and the younger sister were awakened by the gunshot and the mother rushed to the girl's room to meet the girl as she retreated and to observe the defendant standing naked in the corner, with the rifle in hand. Defendant told the mother to "[L]eave (the girl) alone, she's not hurt." The girl's younger sister did not testify as to what she saw. The mother gathered the children, hid them outside, and

- 4 -

returned to the house to call the Sheriff. Defendant had gone back to his bedroom and flopped down on the bed.

Three officers responded. Two Sheriff's Deputies arrived approximately 20 minutes after the call and the Sheriff, Brian Neidhardt, arrived shortly thereafter. The defendant was arrested without incident, and Sheriff Neidhardt took custody of the .22 rifle (which had a fired shell casing in the chamber), and the girl's panties.

The first issue relates to the manner in which the trial court questioned the ten-year-old girl in the presence of the jury. The girl was called to testify as to the events on the night of July 30, 1982, and because of her age the trial court found it necessary to establish that she understood her obligation to tell the truth. Without first excusing the jury, the trial court questioned the girl as follows:

"THE COURT: Lori, do you understand what that was you just took? An oath? Do you understand that?

"THE WITNESS: No.

"THE COURT: Didn't anybody ever explain to you what an oath was?

"THE WITNESS: (nods negative.)

"THE COURT: Well, you know what will happen to you if you lie on the witness stand?

"THE WITNESS: Uh huh (positive.)

"THE COURT: What will happen?

"THE WITNESS: I'll go to juvenile prison.

"THE COURT: Well, do you believe that God will punish you if you lie?

"THE WITNESS: (nods affirmative.)

"MR. PRATT: I would like the record to reflect that the child just nodded her head in the affirmative.

"THE COURT: As well as the Court? You have got the idea the court is going to punish you?

"THE WITNESS: Yeah.

"THE COURT: And I will too, if you lie. But God will do it too; you know that?

"THE WITNESS: Yeah.

"THE COURT: All right. I believe the witness is qualified. Go ahead."

Defendant failed to object to this exchange at the time of trial, but wishes to raise it now on appeal. Section 46-20-104, MCA, provides that failure to make a timely objection at the time of trial constitutes a waiver of the objection and it may not be raised on appeal. Although counsel on appeal (who was not trial counsel) recognizes this waiver, he nonetheless argues that we should consider the issue and reverse by application of the "plain error rule" contained in section 47-20-702, MCA. Under the "plain error rule," jurisdictional and constitutional errors at trial may be reviewed even though the injured party did not object at the time of trial. The rule is therefore an exception to the waiver rule of section 46-20-104, MCA.

Defendant contends that the trial court's questioning of the girl constituted impermissible comment on her credibility as a witness and thereby deprived him of his constitutional right to a fair trial. Although it may have been best to qualify the girl in the absence of the jury, and although the questions asked by the trial judge could have been framed differently, we do not believe the error sufficient to call for application of the "plain error doctrine." Defense counsel did not object to either questioning the witness in front of the jury nor to the manner in which the questions were asked, and we hold that by failing to do so he waived

- 6 -

his right to rely on this as a basis to seek reversal and a new trial. Furthermore, except for the issue of penetration, the elements of both crimes were establishd not only by the testimony of the ten-year-old girl but by independent testimony.

The physical evidence and the testimony of the girl's mother and the Sheriff establishes that the defendant was in the girl's room that night, naked, with a loaded gun, and had his hands and fingers around her vagina.

The physical evidence introduced against the defendant is consistent with the testimonial evidence offered to substantiate the State's theory of the case. The trial court admitted the girl's underpanties (which were stained and contained three hair specimens), the .22 caliber rifle, and photographs of the girl's bedroom and the bullet hole in the wall. Tests performed on the panties showed that the stains were male sperm and were from a type AB secreter of bodily fluids such as semen, vaginal fluid, saliva and sweat. Laboratory tests performed on blood and saliva samples taken from the defendant showed that he is rare blood type AB, and, he is a type AB secreter. Identical tests on blood and saliva samples taken from the girl showed she is a blood type A and a type A secreter. Therefore, because the body substance was that of male sperm from an AB secreter, the expert serologist from the State crime laboratory concluded that the stains were those of the defendant, not those of the girl.

Tests were also performed on three hair specimens that were extracted from the girl's panties. Two of the three specimens were pubic hairs and one of those had characteristics consistent with samples taken from the defendant after

he was arrested.  The second pubic hair was "deteriorated" (old) and could not be tested.

The photographs of the girl's bedroom clearly showed a bullet hole in the bedroom wall directly above where the girl slept on the top bunk of the bunkbed.  Defendant admitted that the bullet hole had not been in the girl's bedroom wall when he went to bed the night of July 30, 1982.  The evidence also showed that no one but the defendant had custody of the gun that night.  It was reasonable for the jury to conclude that the defendant shot the hole in the wall on the night of July 30, 1982, which places him in the girl's bedroom at a very incriminating time.

The physical evidence did not stand alone.  The testimony of the girl's mother is consistent with the physical evidence and corroborates to the extent possible the testimony of the girl.  She testified that only the defendant had custody of the gun after he took it from her that afternoon.  She identified the panties admitted into evidence as the ones the girl had worn to bed.  She testified that she was awakened by a gunshot, and when she heard the girl screaming, she ran into her room.  There she met the girl running out of the room and observed the defendant standing naked in the corner of the bedroom, with the gun in hand.  She testified she then gathered the children and hid them outside the house.

The mother's testimony is compelling.  Her testimony places the defendant in the victim's room on the night of the attack, at the time of the attack, naked, and with a rifle in hand.  Her testimony and the physical evidence discussed above constitute substantial evidence to support the aggravated assault conviction, and, when combined with the testi-

- 8 -

mony of the girl regarding penetration, support as well the conviction for sexual intercourse without consent.

Further corroborating testimony was offered by Sheriff Neidhardt, who talked to the girl and her mother the night of the incident. On direct examination, the Sheriff testified that he arrested the defendant in his bed, naked, and with the rifle (which had a spent shell casing in the chamber) laying against the side of the bed. He also testified on direct that he went into the girl's room and noticed the "soiled" panties on the dresser next to the bunkbed. He recovered these panties as well as the rifle. On cross-examination, the Sheriff testified as to what the girl told him that night about the incident. He testified she told him the defendant had taken her panties off, masturbated in them, spread her legs apart, was looking and touching places he should not have, and when she screamed, defendant fired the gun.

The Sheriff's testimony corroborates the mothers testimony, and adds the evidence of the girl's underpanties. Unlike the Sheriff, the girl's mother had not noticed the panties on the dresser when she entered the room. He testified that the panties were "wet" and seemed "soiled" to him when he recovered them.

Based on this evidence, we do not believe the failure of the trial court to qualify the ten-year-old girl in the absence of the jury, and by asking more sensitive questions, calls for the application of the "plain error doctrine." In light of all the independent and highly damaging evidence against defendant, we do not see that defendant was prejudiced by the manner in which the ten-year-old girl was qualified.

Defendant's second contention is that he was denied a fair trial when the trial court allowed the State to add one witness five days before trial, and three witnesses on the morning of trial, and then denied his motion for a continuance to prepare for those witnesses.

The State amended the information five days before trial to add the expert serologist from the State crime laboratory. The State again amended the information on the morning of trial by adding three witnesses who are employees at the hospital and clinic in Musselshell County. Defense counsel stipulated to the addition of the latter three witnesses so long as they testified only to the chain of custody of the fluid and hair samples they handled. The witnesses testified only as to the chain of custody of the samples taken from the defendant and the girl. We find no merit in defendant's argument that they testified to matters extraneous to chain of custody. Testimony regarding procedures necessary to prepare the samples for shipping to the lab (boiling, packaging) was de minimis.

The other witness added was the State's expert on serology. She was added five days before trial, but it was made clear at that time that defense counsel could interview her at any time during the five days before trial. He elected not to do so. We recognize that defendant's counsel on appeal did not represent the defendant at trial, but that does not alter the fact that trial counsel should have interviewed the witness when given the opportunity to do so.

We further emphasize that the defendant was not prejudiced by testimony of the added witnesses because his own testimony corroborated the important points to which they testified. This being so, any error in allowing the

witnesses to testify or in not granting defendant a continuance, was harmless.

Defendant testified that he went to sleep and woke up to find his wife (the girl's mother) masturbating him. He testified that when she finished, she cleaned him with "some scratchy material" that must have been the girl's underwear. Although he testified that he could not remember seeing the girl in his bedroom that night, that nonetheless her underwear could have been the article used to wipe away his semen. This testimony attempts to explain the compelling inculpatory physical evidence of the male sperm stains and pubic hairs in the girl's underpanties, which evidence was consistent with defendant's blood type and pubic hair characteristics. By this testimony, defendant clearly admitted the existence of the male sperm substances and pubic hairs in the girl's underwear. Based on defendant's own testimony, corroborating the testimony of the added witnesses, we fail to see how defendant has been prejudiced by a ruling either permitting the witnesses to testify or by a ruling refusing to grant a continuance.

The District Court judgment is affirmed.

_Daniel J. Shea_
Justice

We Concur:

_Frank R. Haswell_
Chief Justice

_John C. Sheehy_

_Paul G. Hatfield_

_____
Justices