[No. F036711. Fifth Dist. Sept. 5, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDY AARON HALL, Defendant and Appellant.

**COUNSEL**

Linda Buchser, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Robert P. Whitlock and Jeffrey Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

DETJEN, J.*—Defendant appeals from a judgment following jury trial upon charges of felony assault on a public official and misdemeanor resisting, delaying and obstructing a peace officer. He claims the trial court did not have authority to order that he be tested for AIDS or other communicable diseases and that, if Health and Safety Code section 121060 is determined to cover sweat, the statute infringes on his constitutional rights. Based upon our discussion that follows, we affirm but direct that the trial court amend the abstract of judgment.

### STATEMENT OF THE CASE

An information was filed November 23, 1999, charging Randy Aaron Hall (appellant) with one count of felony assault on a public official, i.e., Tim Donovan, a deputy district attorney (Pen. Code, § 217.1, subd. (a))[1] and one count of resisting, delaying and obstructing a peace officer (§ 148, subd. (a)(1)). The information alleged further that appellant had two prior strike convictions pursuant to sections 667, subdivisions (b)-(i), and 1170.12, subdivisions (a)-(e), and had served two prior prison terms pursuant to section 667.5.

Jury trial began August 14, 2000. On August 15, 2000, the deputy attorney general who was prosecuting the instant case, Jeffrey Firestone, designated the district attorney investigator, Jerry Haroldsen, as the prosecution's chief investigating officer. On August 17, 2000, appellant repeatedly spat on Investigator Haroldsen, making skin contact. Appellant also spat on Firestone many times during the trial.

On August 18, 2000, appellant was found guilty as charged. In a bifurcated jury trial, both strike and prior prison term allegations were found to be true.

Appellant was sentenced on September 18, 2000, to a total term of 27 years to life to run consecutive to his already existing 31-year-to-life term in state prison, imposed in Fresno Superior Court case No. 630410-9. Two $5,000 restitution fines were imposed pursuant to sections 1202.4,

---

*Judge of the Madera Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All further statutory references will be to the Penal Code unless otherwise stated.

subdivision (b), and 1202.45, with the latter suspended pending successful completion of parole. The court ordered appellant be tested for any communicable diseases and the results, including AIDS test results, be made available to Haroldsen and Firestone.

This appeals follows.

## STATEMENT OF THE FACTS

On September 8, 1999, appellant was the defendant in a criminal case in Fresno Superior Court. Upon the clerk's reading of the word "guilty" from the jury's verdict form, appellant jumped up, bolted from his chair sending it flying back, moved around his counsel in a hop while shackled at the ankles, and leaped towards the prosecutor, Deputy District Attorney Timothy Donovan, whom he attacked. Appellant grabbed Donovan's upper torso, repeatedly grabbed at his face and head dislodging his glasses, grabbed around his neck and shoulders, and pulled him down by his suit. Appellant's hands were "very sweaty" and he got sweat from his hands all over Donovan's suit collar. While appellant was attacking Donovan, two bailiffs, Daniel Davies and Bill Elliott, and Investigator Haroldsen tried to intervene. Haroldsen put his arms around appellant's neck and head and tried to pull him backwards away from Donovan. A juror interceded by repeatedly striking appellant until Donovan could get away.

Appellant also struggled with Deputies Davies and Elliott and with Investigator Haroldsen as they tried to restrain him. Haroldsen commanded appellant to stop fighting, but appellant ignored his request. Davies warned appellant he would be shocked if he did not stop fighting. Appellant continued to struggle despite Davies' use of an electronic immobilization device on him. Eventually appellant was brought to the floor and had both wrists restrained with handcuffs. Donovan suffered an abrasion about his eye, swelling near his wrist, and large tears to his suit jacket as a result of appellant's attack. Deputy Elliott also suffered an abrasion and swelling on his forehead and a scrape on his elbow, and Investigator Haroldsen suffered an abrasion under his eye and a scrape to his knee. Appellant suffered no injuries.

*Defense*

Appellant testified that he disagreed with his conviction in the case Donovan prosecuted, which resulted in a 31-year-to-life sentence. Appellant stated Donovan had prosecuted him two or three times before but dismissed those cases after he spent thousands of dollars on lawyers. Appellant felt

Donovan prosecuted him unfairly, set him up, and was playing a game with his life.

Appellant claimed he was innocent in the last case Donovan prosecuted, and he did not believe there would be a guilty verdict. Appellant claimed he did not recall what occurred from the time the word "guilty" was read until he was on the ground being handcuffed. He did recall being shocked and thinking someone was trying to hurt him. While appellant was in a holding cell, he saw a scrape on Deputy Elliott's forehead and he apologized, saying he did not mean to hurt anyone.

Appellant testified he was bipolar and presently on an antidepressant medication, an antiseizure medication, a mood stabilizer medication, and a medication for anxiety. Appellant testified he had not taken his medication during the day of the incident or the week and a half that preceded it. Appellant then testified he was not presently on medication.

*Rebuttal*

Donovan testified that during mid-June 2000 he received a handwritten note purported to be from appellant. A news article also inside the envelope described an incident between a defendant and a prosecutor wherein both individuals died in the attack. The note stated: "You see what happens to your kind when they set people up and play games with other people's lives. You reap what you sow, so you know where that leaves you." Donovan considered the note and article a threat.

*Incidents During the Trial*

On August 15, 2000, Firestone was prosecuting the instant case and designated Haroldsen as the prosecution's chief investigating officer. On August 16, 2000, outside the presence of the jury, appellant threatened Haroldsen and stated, "How does it feel to be a walking dead man?" Haroldsen replied, "Who do you mean, me or you?" and appellant responded, "you."

During trial, appellant was tethered to the counsel table. He repeatedly pushed his chair against counsel's chair, scooting himself closer to Haroldsen and Firestone. As a result, bailiffs had appellant move to the end of the table.

On August 17, 2000, when appellant was brought into the courtroom, he looked at Firestone and said, "You just jumped on the mother-fucking band

wagon, punk." Appellant then spat on Investigator Haroldsen but missed defense counsel. Bailiffs led appellant from the courtroom. While being led out, appellant pointed his finger toward Firestone and said, "your ass is mine."

Later, when Firestone noted that comment for the record, appellant repeatedly spat on Haroldsen. Appellant then looked over to Firestone and muttered, "your ass is mine." Appellant continued to spit at Haroldsen.

After appellant testified, he again spat at Haroldsen. He later repeated his actions, and appellant's spit made contact with Haroldsen's skin. He also continued to spit at Firestone. At that point, Firestone made a request on behalf of Haroldsen that appellant be ordered to submit to AIDS testing. Defense counsel objected, arguing that saliva can transmit AIDS only if it comes in contact with mucus membrane. The court questioned whether it had jurisdiction to order such a test as Haroldsen was not a party to the action. Firestone stated that since appellant's spitting occurred while court was in session and the court had jurisdiction over appellant, it could order such a test.

Not knowing whether such testing was appropriate at this point in the proceedings, both Firestone and the trial court tabled the request until Firestone could find statutory authority for it.

The following day, appellant was led out of the courtroom, so counsel and the sheriff's department could address security concerns. As appellant was being led out, he publicly told Haroldsen he had "full blown AIDS." Defense counsel claimed appellant was joking. The court then stated it would order HIV or AIDS testing on appellant after the case was concluded. No objection was made.

On September 18, 2000, appellant was sentenced. At the hearing, when Firestone brought up the issue of AIDS testing, the court stated it would make such an order. No objection was made. Firestone also stated Haroldsen was concerned about other diseases as well, such as hepatitis B, because appellant had sweated profusely and Haroldsen had been in contact with appellant's sweat. The court stated it was not concerned that it did not have authority to make such an order. No objection was made.

As the court pronounced sentence, appellant again spat at Firestone and on the counsel table. When Firestone noted appellant's spitting, appellant said, "That's right, motherfucker" and spat again. The court directed that Firestone move out of appellant's range. The court then ordered AIDS testing

and testing for any communicable diseases to be performed by the Department of Corrections. No objections were made. The court ordered the results be made available to Haroldsen. No objections were made. While Firestone was making a request, appellant interrupted and stated, "You better ask for some protection, you fucking faggot." The court then stated it would make the test results available to Firestone as well as to Haroldsen. No objection was made.

*Testing*

A sample for testing was collected from appellant on October 3, 2000. Testing was performed on the sample for communicable diseases, including AIDS and forms of hepatitis. The results of those tests were reported on October 4 and 5, 2000, respectively.

## DISCUSSION

*The Trial Court Had Authority to Order Appellant Be Tested for AIDS and Other Communicable Diseases*

Appellant contends that under the circumstances presented here, the court had no statutory authority to make an order that he submit to testing for AIDS or other communicable diseases.

Respondent argues this issue is both moot, as the testing has already been done, and was waived and therefore barred by *People v. Scott* (1994) 9 Cal.4th 331 [36 Cal.Rptr.2d 627, 885 P.2d 1040]. We note that the issue is moot as to appellant. (*In re Khonsavanh S.* (1998) 67 Cal.App.4th 532, 538 fn. 4 [79 Cal.Rptr.2d 80].) Nevertheless, we will decide appellant's contentions on the merits because they raise questions of statewide interest. (*Johnetta J. v. Municipal Court* (1990) 218 Cal.App.3d 1255, 1260 [267 Cal.Rptr. 666].) ■ As to the issue of waiver, *Scott* established the rule that objections to the court's discretionary sentencing choices are waived if they are not argued at the sentencing hearing. (*Scott, supra,* at p. 353.) *Scott,* however, distinguished discretionary sentencing choices from sentences which are unauthorized. Since appellant is arguing the sentence was unauthorized, we will address the issue.

At sentencing, when the court ordered that appellant be tested for HIV and other communicable diseases, it cited no authority for its order. The abstract of judgment, however, shows AIDS testing was ordered pursuant to section 1202.1. That designation was clearly in error. We will address this issue on pages 1024-1025, *post*.

■ "Involuntary AIDS or human immunodeficiency virus (HIV) testing is strictly limited by statute. [Citations.]" (*People v. Guardado* (1995) 40 Cal.App.4th 757, 763 [47 Cal.Rptr.2d 81].) For instance, persons convicted of prostitution may be tested under section 1202.6. Persons convicted of certain sexual offenses may be tested under section 1202.1. Persons accused of certain sexual offenses may be tested under Health and Safety Code section 121055 if the alleged victim petitions for it and the court finds probable cause exists to believe a possible transfer of bodily fluids took place. Inmates who exhibit clinical symptoms of HIV or AIDS may be tested under section 7512.5. Inmates who expose other inmates to their bodily fluids may be tested under section 7512. Inmates who expose law enforcement personnel to their bodily fluids may be tested under sections 7511 and 7510 if the chief medical officer "finds that, considering all of the facts and circumstances, there is a significant risk that HIV was transmitted." (§ 7511.) Finally, any person charged with assaulting a peace officer, firefighter or emergency personnel is subject to involuntary testing for AIDS and other communicable diseases under Health and Safety Code section 121060 where the court finds probable cause exists to believe there was a possible transfer of the defendant's bodily fluid to the skin of the officer, firefighter or emergency personnel. Appellant claims none of these statutes provides authority for the testing ordered here. We disagree.

Health and Safety Code section 121050 provides, in pertinent part:

"The people of the State of California find and declare that AIDS, AIDS-related conditions, and other communicable diseases pose a major threat to the public health and safety.

"The health and safety of the public . . . [and] peace officers . . . who may come into contact with infected persons, have not been adequately protected by law. The purpose of this chapter is to require that information that may be vital to the health and safety of the public . . . [and] peace officers . . . put at risk in the course of their official duties, be obtained and disclosed in an appropriate manner in order that precautions can be taken to preserve their health and the health of others or that those persons can be relieved from groundless fear of infection.

"It is the intent of this chapter to supersede in case of conflict existing statutes or case law on the subjects covered including but not limited to the confidentiality and consent provisions contained in Chapter 7 (commencing with Section 120975), Chapter 8 (commencing with Section 121025), and Chapter 10 (commencing with Section 121075)."

Health and Safety Code section 121060 provides in pertinent part:

"Any person charged in any criminal complaint filed with a . . . court . . . in which it is alleged in whole or in part that the defendant . . . interfered with the official duties of a peace officer . . . by biting, scratching, spitting, or transferring blood or other bodily fluids on, upon, or through the skin or membranes of a peace officer . . . shall in addition to any penalties provided by law be subject to an order of a court having jurisdiction of the complaint or petition requiring testing as provided in this chapter.

"The peace officer . . . or the employing agency, officer, or entity may petition the court for an order authorized under this section.

"The court shall promptly conduct a hearing upon any such petition. If the court finds that probable cause exists to believe that a possible transfer of blood, saliva, semen, or other bodily fluid took place between the defendant . . . and the peace officer . . . the court shall order that the defendant . . . provide two specimens of blood for testing as provided in this chapter.

"Copies of the test results shall be sent to the defendant . . . , each peace officer . . . named in the petition and his or her employing agency, officer, or entity, and if the defendant . . . is incarcerated or detained, to the officer in charge and the chief medical officer of the facility where the person is incarcerated or detained."

The facts of this case fit well within the parameters of Health and Safety Code section 121060. As noted by appellant, Health and Safety Code section 121060 applies where a criminal charge has been filed alleging a defendant has interfered with the official duties of a police officer. Since no criminal charges were filed as a result of appellant's spitting on Investigator Haroldsen and Deputy Attorney General Firestone, Health and Safety Code section 121060 cannot be applied to the spitting incidents. ■ However, appellant was charged with resisting, delaying and obstructing a peace officer in the performance of his duties (§ 148, subd. (a)(1)), which falls within Health and Safety Code section 121060's criteria that he be charged in a criminal complaint with "interfer[ing] with the official duties of a peace officer." At trial, evidence was presented that Haroldsen was one of the peace officers with whom appellant interfered. In an attempt to pull appellant away from Deputy District Attorney Donovan, Haroldsen put his arm around appellant's neck and head. Appellant actively resisted and did not stop until he was brought to the floor and had his hands restrained with handcuffs. Appellant's hands were "very sweaty." A reasonable inference is that Haroldsen's skin came in contact with appellant's sweat during handcuffing. Haroldsen suffered an abrasion under his eye and a scrape on his knee during the altercation. It is possible appellant's sweat may have made contact with Haroldsen's facial abrasion during the struggle.

■■ Appellant further contends that sweat does not come within the definition of Health and Safety Code section 121060 because sweat is not a carrier of infection. We disagree with appellant's contention and find that sweat does fit within the definition of Health and Safety Code section 121060.

No case authority exists which addresses the issue of whether sweat is a bodily fluid for purposes of Health and Safety Code section 121060. To determine whether it is, we interpret the clause in light of well-established principles of statutory construction. ■■ The starting point for statutory construction is "the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) At the outset, it is necessary to examine the language of the code section to determine if the words used unequivocally express the Legislature's intent. (*Ibid.*; *People v. Craft* (1986) 41 Cal.3d 554, 560 [224 Cal.Rptr. 626, 715 P.2d 585].) "If no ambiguity, uncertainty, or doubt about the meaning of the statute appear, the provision is to be applied according to its terms without further judicial construction. [Citation.]" (*Morse v. Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46].) "However, when the language in the statute is unclear, ambiguous or susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, and the statutory scheme of which the statute is a part." (*People v. Bartlett* (1990) 226 Cal.App.3d 244, 250 [276 Cal.Rptr. 460].)

■■ Applying these principles of statutory construction to the provision at issue in the present case, "we find the language of the code itself carries us a considerable distance." (*Morse v. Municipal Court, supra*, 13 Cal.3d at p. 156.) Webster's New World Dictionary (2d college ed. 1982) defines sweat, inter alia, as "the clear, alkaline, salty liquid given forth in drops through pores of the skin; perspiration." Thus, a plain, usual, ordinary and commonsense meaning of the phrase "other bodily fluids" includes sweat. (See, e.g., *People v. Silva* (2001) 25 Cal.4th 345, 356 [106 Cal.Rptr.2d 93, 21 P.3d 769] [noting sweat or saliva on victim was from a person "who was a secretor (a person whose blood type can be determined from bodily fluids other than blood, such as sweat, semen, and saliva)"]; *State v. Smith* (1984) 208 Mont. 66, 72 [676 P.2d 185, 189] ["Tests performed on the panties showed that the stains were male sperm and were from a type AB secretor of bodily fluids such as semen, vaginal fluid, saliva and sweat"]; *Kellogg v. California Western States Life Ins. Co.* (1949) 114 Utah 567, 569 [201 P.2d 949, 950] [doctor's testimony that, "Post-operative shock usually results from severe trauma on the sympathetic nervous system of the body, also loss of blood, loss of bodily fluids in the way of perspiration"].)

Chapter 9, entitled "Acquired Immune Deficiency Syndrome (AIDS) Public Safety and Testing Disclosure," codified at Health and Safety Code section 121050 et seq. and including section 121060, does not define the phrase "other bodily fluids." Had the Legislature intended the courts to adopt something other than its plain, usual, ordinary and commonsense meaning it could have stated so. For example, in chapter 10.5, entitled "AIDS Exposure Notification," Health and Safety Code section 121132 states, in pertinent part, that " 'other potentially infectious materials' means those body fluids identified by the Division of Occupational Safety and Health as potentially capable of transmitting HIV." Section 7502 defines "bodily fluids" as "blood, semen, or any other bodily fluid identified by either the federal Centers for Disease Control or State Department of Health Services in appropriate regulations as capable of transmitting HIV." Section 1524.1, subdivision (b)(2) defines bodily fluids similarly to that in section 7502. Here, the absence of a more definitive description of the phrase "other bodily fluids" strongly suggests the phrase should be construed in its ordinary, everyday sense. (Cf. *People v. Martinez* (1995) 11 Cal.4th 434, 451 [45 Cal.Rptr.2d 905, 903 P.2d 1037] [if Legislature intended to define code section in terms of specific intimate bodily contact, it could easily have done so; absence of such language strongly suggests such touchings are not restricted in this manner].)

We find the plain meaning of the language in Health and Safety Code section 121060 includes sweat as a bodily fluid. Accordingly, based on the foregoing, the court was authorized to order AIDS and communicable disease testing pursuant to Health and Safety Code sections 121050 and 121060 based upon the charge and evidence before it.

*To the Extent Health and Safety Code Section 121060 Is Interpreted to Include Sweat in the Term "Other Bodily Fluids," It Does Not Violate the Fourth Amendment*

Appellant contends that if it is determined that sweat is included within the phrase "other bodily fluids" in Health and Safety Code section 121060, then the statute violates the proscription against unreasonable searches and seizures as proscribed by the Fourth Amendment. Respondent is correct in noting that appellant failed to raise this issue below. We reject appellant's constitutional arguments because no objection on these grounds was raised below. (*People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People v. Raley* (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712].) In any event, we find the argument to be without merit.

There is no doubt that a mandatory blood test is a search subject to the Fourth Amendment because of both the physical penetration for removal

of bodily fluid and because of subsequent chemical testing, which leads to revelation of private medical information. (*Skinner v. Railway Labor Executives Assn.* (1989) 489 U.S. 602, 616 [109 S.Ct. 1402, 1412-1413, 103 L.Ed.2d 639].) The Fourth Amendment does not proscribe all searches, but only those that are unreasonable. The reasonableness of a particular kind of search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." (*Delaware v. Prouse* (1979) 440 U.S. 648, 654 [99 S.Ct. 1391, 1396, 59 L.Ed.2d 660], fn. omitted.)

In *Johnetta J. v. Municipal Court, supra,* 218 Cal.App.3d 1255, the court addressed a Fourth Amendment challenge to Health and Safety Code former section 199.95 et seq. enacted by the voters in 1988 as part of Proposition 96. That section, now renumbered, is Health and Safety Code section 121050 et seq., which is at issue here.

In *Johnetta J.,* the defendant argued the mandatory AIDS test, ordered after she bit an officer, violated the Fourth Amendment because it permitted bodily intrusion without probable cause to believe the AIDS virus would be found, and the statute failed to provide for a balancing test to determine the propriety of the intrusion under the circumstances. (*Johnetta J. v. Municipal Court, supra,* 218 Cal.App.3d at p. 1270.) The court rejected that claim, relying on the United States Supreme Court's "special needs" rule articulated in *Skinner, supra,* 489 U.S. at page 619 [109 S.Ct. at p. 1414]. (*Johnetta J., supra,* at pp. 1272-1274.) Such a rule provides an exception to the warrant requirement " 'when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impractical." ' " (*Id.* at p. 1272.)

The court in *Johnetta J.* found the statutory scheme enacted by Proposition 96 stemmed from the "substantial" special need of protecting the health and safety of law enforcement officers, thereby justifying the relaxation of the normal Fourth Amendment requirement of individualized suspicion that the tested person is infected with AIDS. It specifically rejected the contention that the state must have probable cause to believe the person will test HIV positive, noting that "medical opinion cannot rule out the possibility of HIV transfer to an officer suffering a bite." (*Johnetta J. v. Municipal Court, supra,* 218 Cal.App.3d at pp. 1279-1284.) The court further found that the balance of interests weighed in favor of the statute because blood testing is a minor intrusion warranting limited protection (*id.* at pp. 1275-1277); a probable cause requirement would not be practical as there is no way for the officer to know the infection status of the person who assaulted him or her (*id.* at p. 1280); the statute applied to individuals accused of assaultive crimes who

have limited expectation of privacy (*id.* at p. 1282); and the statute did not require blanket testing or exclusion from society of those tested, but required a probable cause finding of fluid transfer, a medically approved test procedure, and strict limitations on disclosure. (*Id.* at p. 1284.)

Appellant attempts to distinguish *Johnetta J.* by arguing there is no possibility that infectious diseases are transmitted through sweat.[2] However, since we have found that sweat is a bodily fluid pursuant to Health and Safety Code section 121060, it follows that the same special need of protecting the health and safety of law enforcement officers exists which justifies the relaxation of the Fourth Amendment requirement of individualized suspicion that the test person is infected with AIDS. The mandatory AIDS testing did not violate appellant's rights under the Fourth Amendment.

*To the Extent Health and Safety Code Section 121060 Is Interpreted to Include Sweat in the Term "Other Bodily Fluids," It Does Not Violate the Right to Privacy*

Appellant also argues that if Health and Safety Code section 121060 is interpreted to include sweat in the term "other bodily fluid," it violates his right of privacy. Once again we note this issue was not argued at trial and is therefore waived. (*People v. Clark, supra,* 5 Cal.4th at p. 988; *People v. Raley, supra,* 2 Cal.4th at p. 892.) In any event, we find the argument to be without merit.

Appellant correctly notes that the California right to privacy is a fundamental right, explicitly added by the voters to the state Constitution in 1972. (*Central Valley Chap. 7th Step Foundation v. Younger* (1979) 95 Cal.App.3d 212, 234-235 [157 Cal.Rptr. 117].) However, that right is "not absolute" and may be subordinated to a compelling state interest. (*Boler v. Superior Court* (1987) 201 Cal.App.3d 467, 473 [247 Cal.Rptr. 185].)

The issue that an AIDS test is a violation of privacy was also discussed and rejected in *Johnetta J.* The court in *Johnetta J.* held that the electorate enacted a statute that found public safety officers at risk from anxiety and fatal infection in the course of their duties. Since medical opinion could not rule out the possibility of HIV transfer from a bite to an officer, the testing was done in a medically approved manner, the test results were subject to limited disclosure, and a blood test is highly useful to treatment of an assaulted officer, "the state's interest is sufficiently compelling to overcome

---

[2]We deny appellant's request to take judicial notice of various documents. Appellant did not request judicial notice of these items in the trial court, and they are not proper items for judicial notice under Evidence Code section 451 or 452. (See Evid. Code, § 459, subd. (a).)

petitioner's right of privacy against what we have already concluded is a minimal intrusion." (*Johnetta J. v. Municipal Court, supra*, 218 Cal.App.3d at p. 1283.)

For these same reasons, appellant's claim that Health and Safety Code section 121060 violates his right to privacy is rejected.

*To the Extent Health and Safety Code Section 121060 Is Interpreted to Include Sweat in the Term "Other Bodily Fluids," It Does Not Violate Equal Protection*

■ Appellant also argues that if Health and Safety Code section 121060 is interpreted to include sweat in the term "other bodily fluids," it violates his constitutional right to equal protection. Once again we note this issue was not argued at trial and is therefore waived. (*People v. Clark, supra*, 5 Cal.4th at p. 988; *People v. Raley, supra*, 2 Cal.4th at p. 892.) In any event, we find the argument to be without merit.

Appellant acknowledges that equal protection demands that persons who are similarly situated must receive similar treatment. As argued by appellant, however, to include sweat in the phrase "other bodily fluids" treats differently those who sweat and those who do not sweat.

Even if we are to assume appellant's statement is correct, by definition, those who sweat and those who do not sweat are not similarly situated. The constitutional guaranty of equal protection of the laws means simply that persons similarly situated with respect to the purpose of the law must be similarly treated under the law. (*In re Gary W.* (1971) 5 Cal.3d 296, 303 [96 Cal.Rptr. 1, 486 P.2d 1201]; *People v. Carter* (1994) 30 Cal.App.4th 775, 778 [37 Cal.Rptr.2d 59].) If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. (*People v. Gibson* (1988) 204 Cal.App.3d 1425, 1436 [252 Cal.Rptr. 56].)

Appellant's equal protection claim lacks merit and is rejected.

*The Abstract of Judgment Must Be Corrected*

Appellant contends that in the event the testing order is not stricken, the abstract of judgment should be amended to reflect the correct authority for the testing. Respondent agrees.

The abstract of judgment has section 1202.1 marked as the authority for the AIDS testing. As was discussed, *ante*, at page 1018, that statute is

inapplicable in this situation. Rather, the box marked "other (specify)" should be checked and Health and Safety Code sections 121050 and 121060 should be specified. The abstract of judgment should be amended accordingly. (*People v. Cecil* (1982) 127 Cal.App.3d 769, 773 [179 Cal.Rptr. 736].)

### DISPOSITION

The matter is remanded with directions to the clerk of the court to issue an amended abstract of judgment which reflects that appellant submit to AIDS testing pursuant to Health and Safety Code sections 121050 and 121060 and not pursuant to Penal Code section 1202.1. The clerk is directed to forward a copy of the amended abstract to the appropriate authorities. In all other respects, the judgment is affirmed.

Ardaiz, P. J., and Buckley, J., concurred.