44 Cal.Rptr.3d 177 (2006)
139 Cal.App.4th 1271
The PEOPLE, Plaintiff and Respondent,
v.
Antwan TRAVIS, Defendant and Appellant.
No. A109342.
Court of Appeal, First District, Division One.
May 26, 2006.
*181 Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Gerald A. Engler, Assistant Attorneys General, Enid A. Camps, Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.
SWAGER, J.
In this appeal from a judgment of conviction following a guilty plea defendant challenges the constitutionality of the most recent amendment of the California DNA sample collection law, Penal Code section *182 296.1, upon which the trial court relied to impose an order for DNA testing upon him. We conclude that the statute does not offend constitutional principles, and affirm the judgment.

STATEMENT OF FACTS AND PROCEDURAL HISTORY[1]
Defendant entered a negotiated plea of guilty to one count of felony driving under the influence of alcohol (Veh.Code, § 23152, subd. (a)), and admitted that he suffered two prior convictions for driving under the influence of alcohol within the past 10 years (Veh.Code, § 23550.5).[2] He was sentenced to a state prison term of 16 months, to run concurrently with a six-year sentence imposed in a separate Contra Costa County Superior Court action. Over objection by the defense, the trial court also ordered defendant to "submit to DNA testing" and provide print impressions pursuant to Penal Code section 296, subdivision (a)(1).[3]

DISCUSSION
Defendant challenges the constitutionality of section 296, subdivision (a)(1), which specifies that a DNA sample and print impressions must be provided for collection and storage in a state database by, "Any person, including any juvenile, who is convicted of or pleads guilty or no contest to any felony offense, or is found not guilty by reason of insanity of any felony offense, or any juvenile who is adjudicated under Section 602 of the Welfare and Institutions Code for committing any felony offense."[4] (Italics added.) Section 296 in its present form was enacted as part of the 2004 DNA Fingerprint, Unsolved Crime and Innocence Protection Act (Prop.69). (§ 295, subd. (a).) Section 296 and the remainder of the DNA and Forensic Identification Database and Data Bank Act govern the collection of DNA samples and specimens from persons convicted of all felonies, rather than only enumerated crimes as provided under the former statute. (Coffey v. Superior Court (2005) 129 Cal.App.4th 809, 814, 29 Cal.Rptr.3d 59.) The California Department of Justice (DOJ) is responsible for implementing the act (§ 295, subd. (h)), the DNA Laboratory, Department of Corrections, Board of Corrections, and Department of the Youth Authority, has the authority to adopt policies and enact regulations for the implementation of the act (§ 295, subds. (h)(1), (i)(1)), and the county sheriffs or chief administrative officers at jails or other county facilities have responsibility for collection of samples in accordance with approved procedures. (§ 295, subd. (i)(1), (2); People v. Dial (2005) 130 Cal.App.4th 657, 661, 30 Cal.Rptr.3d 252.) The DOJ then serves as a repository for the collected *183 samples, performs a DNA analysis, and maintains the DNA profiles for comparison to samples taken at other crime scenes, in order to establish the identity and origin of those crime scene samples. (§§ 295.1, subds.(a), (c), 297, subd. (a); Coffey v. Superior Court, supra, at p. 814, 29 Cal. Rptr.3d 59.) The provisions of the act are mandatory and automatic upon conviction of a felony. (People v. Brewer (2001) 87 Cal.App.4th 1298, 1302, 105 Cal.Rptr.2d 293; People v. Hong (1998) 64 Cal.App.4th 1071, 1083, 76 Cal.Rptr.2d 23.) The persons specified in the actthat is, anyone convicted of any felony offense"shall" provide samples, "and the requirements of the chapter (Pen.Code, pt. 1, tit. 9, ch. 6; §§ 295-300.3) `shall apply to all qualifying persons regardless of sentence imposed ... or any other disposition rendered in the case of an adult ..., or whether the person is diverted, fined, or referred for evaluation....' (§ 296, subd. (b).)" (People v. Dial, supra, at p. 662, 30 Cal.Rptr.3d 252.)
The trial court acted under the authority of the current version of section 296, subdivision (a)(1), by ordering defendant to submit a DNA sample as a result of his felony conviction of driving under the influence of alcohol. In this appeal, defendant presents several constitutional objections to the forced extraction and collection of DNA samples from all felony offenders: that the intrusion upon his privacy rights violated the Fourth Amendment prohibition against unreasonable searches and seizures; that his equal protection rights were violated; that the statute is overbroad and offends due process principles; and, that as applied to him the statute constitutes an ex post facto law. He requests that we modify his sentence to "exclude the mandatory sampling required by section 296," and "if [the] samples have already been taken," to order the samples "removed from any data bank and destroyed."

I. The Claim of Mootness.
Before we proceed to the substance of the constitutional claims presented by defendant, we deal with respondent's contention, made almost in passing, that defendant's appeal is "moot because he is independently required to provide a DNA sample based on his prior felony convictions" pursuant to section 296.1, subdivision (a)(2)(A)(i).[5] Respondent's position seems to be that the availability of a basis *184 for requiring a DNA sample from defendant other than merely his present driving under the influence conviction renders his challenge to the trial court's order moot.
We do not find the present appeal moot. "`As a general rule, "an appeal presenting only abstract or academic questions is subject to dismissal as moot." [Citation.]' [Citation.]" (In re Joshua C. (1994) 24 Cal.App.4th 1544, 1547, 30 Cal. Rptr.2d 10.) "`When no effective relief can be granted, an appeal is moot and will be dismissed.' [Citations.]" (MHC Operating Limited Partnership v. City of San Jose (2003) 106 Cal.App.4th 204, 214, 130 Cal.Rptr.2d 564; see also Lester v. Lennane (2000) 84 Cal.App.4th 536, 566, 101 Cal.Rptr.2d 86.) "`"It necessarily follows that when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal."' [Citations.]" (Chantiles v. Lake Forest II Master Homeowners Assn. (1995) 37 Cal.App.4th 914, 921, 45 Cal. Rptr.2d 1; see also People v. DeLong (2002) 101 Cal.App.4th 482, 486, 124 Cal. Rptr.2d 293; In re Joel H. (1993) 19 Cal. App.4th 1185, 1193, 23 Cal.Rptr.2d 878.) Although defendant may qualify for DNA testing under section 296.1 based upon his prior felony convictions for driving under the influence, in addition to the conviction obtained in the present case, we are not prevented from rendering effective relief if the statute is found unconstitutional. Defendant has challenged the constitutionality of section 296 in its entirety, and specifically the provisions that mandate collection of DNA samples for all felony convictions and for prior convictions for driving under the influence. If we rule in favor of defendant on the constitutional claims he has raised, he will obtain the relief he seeks. Defendant has also presented us with constitutional issues of public interest that may recur between these parties or others, which we have discretion to address even if we were to consider the appeal moot. (See White v. Davis (2003) 30 Cal.4th 528, 537, 133 Cal.Rptr.2d 648, 68 P.3d 74; Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga (2000) 82 Cal.App.4th 473, 479-480, 98 Cal. Rptr.2d 202; In re Robert A. (1992) 4 Cal.App.4th 174, 182, 5 Cal.Rptr.2d 438.) Thus, we decline to find that defendant has raised only moot points. (See Edelstein v. City and County of San Francisco (2002) 29 Cal.4th 164, 171-172, 126 Cal.Rptr.2d 727, 56 P.3d 1029; In re William M. (1970) 3 Cal.3d 16, 23, 89 Cal.Rptr. 33, 473 P.2d 737; People v. Matute (2002) 103 Cal. App.4th 1437, 1444-1445, 127 Cal.Rptr.2d 472; People v. DeLong, supra, at p. 492, 124 Cal.Rptr.2d 293.)

II. The Validity of Section 296 Under the Fourth Amendment.
We turn to defendant's claim that section 296 "as amended in 2004 violates the Fourth Amendment." His argument is that the statute mandates the collection of DNA samples, without the necessity of a warrant or probable cause, for an excessively broad range of qualifying convictions that includes "all felonies," and particularly his current and prior convictions for driving under the influence.
We commence our analysis with recognition of the established principle that the compulsory, nonconsensual extraction of DNA samples constitutes a search and seizure under the Fourth Amendment. (See Skinner v. Railway Labor Executives' Assn. (1989) 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639; Schmerber v. California (1966) 384 U.S. 757, 767, 86 *185 S.Ct. 1826, 16 L.Ed.2d 908; Loder v. City of Glendale (1997) 14 Cal.4th 846, 867, 59 Cal.Rptr.2d 696, 927 P.2d 1200; People v. Adams (2004) 115 Cal.App.4th 243, 255-256, 9 Cal.Rptr.3d 170.) Governmentally compelled testing also implicates the state right of privacy. (Cal. Const., art. I, §§ 1, 13; Loder v. City of Glendale, supra, at p. 896, 59 Cal.Rptr.2d 696, 927 P.2d 1200; Wainwright v. Superior Court (2000) 84 Cal.App.4th 262, 267-268, 100 Cal.Rptr.2d 749.) "`"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable"' under the Fourth Amendment's warrant requirement unless they fall within one of a few narrow exceptions thereto. [Citation.]" (People v. Osband (1996) 13 Cal.4th 622, 673, 55 Cal.Rptr.2d 26, 919 P.2d 640.)
However, "to find the Fourth Amendment applicable to the procedures at issue here `is only to begin the inquiry into the standards governing such intrusions....' [Citation.]" (People v. King (2000) 82 Cal. App.4th 1363, 1371, 99 Cal.Rptr.2d 220, quoting from Skinner v. Railway Labor Executives' Assn., supra, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639.) "The Fourth Amendment does not proscribe all searches, but only those that are unreasonable." (People v. Hall (2002) 101 Cal.App.4th 1009, 1022, 124 Cal.Rptr.2d 806; see also Maryland v. Buie (1990) 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276; Baughman v. State of California (1995) 38 Cal.App.4th 182, 190, 45 Cal. Rptr.2d 82.) "Although reasonableness in most criminal cases depends on the government's obtaining a warrant supported by probable cause, the Supreme Court has emphasized `the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance.' Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989); accord Skinner, 489 U.S. at 624, 109 S.Ct. at 1417 (`[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable.')." (Padgett v. Donald (11th Cir.2005) 401 F.3d 1273, 1277; see also People v. Reyes (1998) 19 Cal.4th 743, 751, 80 Cal.Rptr.2d 734, 968 P.2d 445.)
"`The touchstone of the Fourth Amendment is reasonableness. [Citation.] The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.' [Citation.]" (People v. Jenkins (2000) 22 Cal.4th 900, 971, 95 Cal. Rptr.2d 377, 997 P.2d 1044.) "If the search is reasonable, there is no constitutional problem, for the Fourth Amendment only protects individuals from unreasonable searches and seizures. Skinner, 489 U.S. at 619, 109 S.Ct. 1402 [103 L.Ed.2d 639]. Determining whether a search is reasonable `"depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself,"' Skinner, 489 U.S. at 619 [109 S.Ct. 1402]...." (United States v. Sczubelek (3d Cir.2005) 402 F.3d 175, 182.) "Under the Fourth Amendment and the parallel search and seizure clause of the California Constitution (art. I, § 13), the reasonableness of particular searches and seizures is determined by a general balancing test `weighing the gravity of the governmental interest or public concern served and the degree to which the [challenged government conduct] advances that concern against the intrusiveness of the interference with individual liberty.' [Citation.]" (Hill v. National Collegiate Athletic Assn. (1994) 7 Cal.4th 1, 29-30, 26 Cal.Rptr.2d 834, 865 P.2d 633, fn. omitted; see also Delaware v. Prouse (1979) 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660; People *186 v. Ledesma (2003) 106 Cal.App.4th 857, 863, 131 Cal.Rptr.2d 249.)
We examine several factors to determine whether an intrusion amounts to an unreasonable search or invasion of privacy rights: "(1) the individual's interest, (2) the government's interest, (3) the necessity for the intrusion, and (4) the procedure used in conducting the search. To assess the first factor, the court looks to a hierarchy of privacy interests. Reasonable expectations of privacy that society is prepared to recognize as legitimate receive the greatest level of protection; diminished expectations of privacy are more easily invaded; and subjective expectations of privacy that society is not prepared to recognize as legitimate have no protection." (People v. Reyes, supra, 19 Cal.4th 743, 751, 80 Cal.Rptr.2d 734, 968 P.2d 445; see also Wainwright v. Superior Court, supra, 84 Cal.App.4th 262, 267-268, 100 Cal.Rptr.2d 749.)
In People v. King, supra, 82 Cal.App.4th 1363, 1369, 99 Cal.Rptr.2d 220 (King), this court was presented with a Fourth Amendment challenge to former section 290.2, the predecessor of section 296, "which required persons convicted of specified sex offenses, including rape, or of murder or felony assault and battery, and who were `discharged or paroled from' a `state prison, county jail, or any institution,' to `provide two specimens of blood and a saliva sample'" to be sent to the DOJ for "a DNA analysis on the specimens, and provided that `DNA analysis and other genetic typing analysis' could be used only for law enforcement purposes." The defendant in King contended that his convictions for murder with special circumstances, first degree burglary, sodomy and attempted rape were based upon inadmissible evidence of DNA recovered from the crime scene that matched samples previously collected from him pursuant to section 290.2. We proceeded to examine the reasonableness of the procedure "`"by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."' [Citations.]" (King, supra, at p. 1371, 99 Cal.Rptr.2d 220.) We noted that in accord with the United States Supreme Court decision in Skinner v. Railway Labor Executives' Assn., supra, 489 U.S. 602, 624, 109 S.Ct. 1402, 103 L.Ed.2d 639, even without an "individualized suspicion" to justify the intrusion, "`In limited circumstances, where the privacy interests implicated by a search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.' [Citations.]" (King, supra, at pp. 1373-1374, 99 Cal.Rptr.2d 220.) In our assessment of the balancing test, we considered "`the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' (Bell v. Wolfish (1979) 441 U.S. 520, 559 [99 S.Ct. 1861, 1884, 60 L.Ed.2d 447].)" (Id., at p. 1371, 99 Cal.Rptr.2d 220.)
We observed in King that in contrast to the investigation of a "typical criminal case," in which "investigators exercise great discretion" and "inconvenience involved persons" with searches that may "generate fear and surprise," when the "`search' is the securing of blood and saliva samples for DNA analysis and profiling" outside the investigation of a "particular crime," the "decision to obtain a sample from a particular person is not subject to official discretion. There is no focus on a particular person. As those who are required to provide samples doubtless know, every person of the specified class is required to provide a sample. *187 The person supplying the samples therefore has no reason to fear that the intrusion suggests a belief by the authorities that he or she has committed any criminal offense, or that he or she may be subjected to any further investigation. The fact that the person is already incarcerated also tends to reduce the inconvenience of having to go to a particular place to provide samples." (King, supra, 82 Cal.App.4th 1363, 1372, 1373, 99 Cal.Rptr.2d 220.) We found "[t]here is little reason to require a warrant in such circumstances." (Id., at p. 1373, 99 Cal.Rptr.2d 220.) We explained that a warrant "provides little or no additional protection to personal privacy when, as in the present case, the circumstances justifying the testing and the permissible limits of the intrusion are defined narrowly and specifically, these circumstances doubtless are well-known to those in the class of persons to be tested, and the decision to test is not discretionary and thus is not based on a judgment that certain conditions are present. In such circumstances `there are simply "no special facts for a neutral magistrate to evaluate,"' and it is reasonable to dispense with the warrant requirement. [Citations.]" (Ibid.)
Turning to an examination of the nature and scope of the intrusion, we stated: "Although prisons are not beyond the reach of the Constitution, `it is also clear that imprisonment carries with it the circumspection or loss of many significant rights.' (Hudson v. Palmer (1984) 468 U.S. 517, 523-524 [104 S.Ct. 3194, 3199, 82 L.Ed.2d 393].) The nature of confinement necessarily results in a significant reduction in the expectation of privacy." (King, supra, 82 Cal.App.4th 1363, 1374, 99 Cal.Rptr.2d 220.) "The reduction in a convicted person's reasonable expectation of privacy specifically extends to that person's identity. Indeed, not only persons convicted of crimes, but also those merely suspected of crimes, routinely are required to undergo fingerprinting for identification purposes. As to convicted persons, there is no question but that the state's interest extends to maintaining a permanent record of identity to be used as an aid in solving past and future crimes, and this interest overcomes any privacy rights the individual might retain. `This becomes readily apparent when we consider the universal approbation of "booking" procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification....' [Citation.]" (Ibid.) We concluded: "`The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as "legitimate." [Citation.] What expectations are legitimate varies, of course, with context [citation], depending, for example upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park.' [Citation.] By their commissions of a crime and subsequent convictions, persons such as appellant have forfeited any legitimate expectation of privacy in their identities. In short, any argument that Fourth Amendment privacy interests do not prohibit gathering information concerning identity from the person of one who has been convicted of a serious crime, or of retaining that information for crime enforcement purposes, is an argument that long ago was resolved in favor of the government." (Id., at p. 1375, 99 Cal.Rptr.2d 220, fn. omitted.) Citing Skinner v. Railway Labor Executives' Assn., supra, 489 U.S. 602, 625, 109 S.Ct. 1402, 103 L.Ed.2d 639, we added that blood tests have not been found to "`"constitute an unduly extensive imposition on an individual's privacy and bodily integrity." [Citations.]' [Citation.] Moreover, again, persons such as appellant already *188 are subject to blood tests for purposes of testing for AIDS. Again, the intrusion caused by the testing here is less than overwhelming." (Id., at p. 1378, 99 Cal. Rptr.2d 220.)
Lastly, we considered the undeniable governmental interest "in crime prevention. It has interests in solving crimes that have been committed, in bringing the perpetrators to justice and in preventing, or at least discouraging, them from committing additional crimes. The government also has an interest in ensuring that innocent persons are not needlessly investigatedto say nothing of convictedof crimes they did not commit.[ ] DNA testing unquestionably furthers these interests. The ability to match DNA profiles derived from crime scene evidence to DNA profiles in an existing data bank can enable law enforcement personnel to solve crimes expeditiously and prevent needless interference with the privacy interests of innocent persons. It has been suggested that DNA profiling may act as a deterrent to future criminal activity. (Roe v. Marcotte (2d Cir.1999) 193 F.3d 72, 79.) It also is an unfortunate truth that many offenders commit more than one crime, and recidivism is common." (King, supra, 82 Cal.App.4th 1363, 1375-1376, 99 Cal. Rptr.2d 220, fn. omitted.) On "[t]he final question" of "the efficacy of DNA testing as a means for meeting the governmental interests at stake," we declared: "There is no question but that by providing an effective means of identification, DNA testing is an efficient means of promoting the governmental interests at stake." (Id., at p. 1378, 99 Cal.Rptr.2d 220.) We thus concluded that the statutory DNA extraction and collection procedures "do not violate the Fourth Amendment." (Ibid.)
When presented with subsequent versions of California statutes providing for the forced extraction of blood or saliva for inclusion in the DNA database, two cases followed King and similarly found no violation of the Fourth Amendment or privacy rights: first, Alfaro v. Terhune (2002) 98 Cal.App.4th 492, 120 Cal.Rptr.2d 197 (Alfaro); then, People v. Adams, supra, 115 Cal.App.4th 243, 9 Cal.Rptr.3d 170 (Adams). In Alfaro, the plaintiffs were prisoners under sentence of death who challenged the implementation and application to them of the DNA and Forensic Identification Database and Data Bank Act of 1998 (§ 295 et seq.), which provided that "any person who is convicted of a specified crime must `provide two specimens of blood, a saliva sample, right thumbprints, and a full palm print impression of each hand for law enforcement identification analysis.' (§ 296, subd. (a)(1).)" (Alfaro, supra, at p. 496, 120 Cal.Rptr.2d 197.) The prisoners asserted that the Act violated the constitutional prohibition against unreasonable searches and seizures and their privacy rights, "because `one of the key purposes justifying the [Act]the deterrence of future crimesis inapplicable' to those prisoners." (Id. at p. 497, 120 Cal.Rptr.2d 197.)
The court began its inquiry in Alfaro with the observation that, "DNA data base and data bank acts have been enacted in all 50 states as well as by the federal government. (See 42 U.S.C. §§ 14131-14134; and see Annot., Validity, Construction, and Operation of State DNA Database Statutes (2000) 76 A.L.R.5th 239, 252.) Various constitutional challenges to these acts have been rejected consistently. (See, e.g., Roe v. Marcotte (2d Cir.1999) 193 F.3d 72 [Connecticut]; Schlicher v.(NFN) Peters, I & I (10th Cir.1996) 103 F.3d 940 [Kansas]; Boling v. Romer (10th Cir.1996) 101 F.3d 1336 [Colorado]; Rise v. State of Oregon (9th Cir.1995) 59 F.3d 1556[ ] [Oregon]; Jones v. Murray (4th Cir.1992) 962 F.2d 302 [Virginia].)" (Alfaro, supra, 98 Cal.App.4th 492, 505, 120 *189 Cal.Rptr.2d 197.) The court also recognized that a "challenge to former section 290.2, the predecessor of the Act, was rejected in this state by People v. King (2000) 82 Cal.App.4th 1363 [99 Cal.Rptr.2d 220]." (Ibid.) "In view of the thoroughness with which constitutional challenges to DNA data base and data bank acts have been discussed," the court ventured to add only: "We agree with existing authorities that (1) nonconsensual extraction of biological samples for identification purposes does implicate constitutional interests; (2) those convicted of serious crimes have a diminished expectation of privacy and the intrusions authorized by the Act are minimal; and (3) the Act serves compelling governmental interests. Not the least of the governmental interests served by the Act is `the overwhelming public interest in prosecuting crimes accurately.' [Citation.] A minimally intrusive methodology that can serve to avoid erroneous convictions and to bring to light and rectify erroneous convictions that have occurred manifestly serves a compelling public interest. We agree with the decisional authorities that have gone before and conclude that the balance must be struck in favor of the validity of the Act." (Id., at pp. 505-506, 120 Cal.Rptr.2d 197, italics omitted.)
In response to the plaintiffs' complaint that DNA testing has "the potential to reveal sensitive personal and biological information," the court stated that "the Act specifically limits to identification purposes the DNA and other forensic identification analyses authorized by the Act. (§ 295.1.) Defendants are authorized to analyze specimens and samples `in order to establish identity and origin of samples for identification purposes.' (§ 297, subd. (a).) The Act exempts all DNA and forensic identification profiles and other identification information from any law requiring disclosure of information to the public, and it makes such information confidential. (§ 299.5, subds.(a), (b).)[ ] As was the case in Rise v. State of Oregon, supra, 59 F.3d at page 1561, the Act appropriately limits the state's use of the specimens, samples, and print impressions that it requires." (Alfaro, supra, 98 Cal.App.4th 492, 507-508, 120 Cal.Rptr.2d 197, fn. omitted.) And to specifically address the plaintiffs' claim that as prisoners under sentence of death the Act as applied to them did not deter or prevent future criminality, the court reasoned that DNA acts have been "specifically ... upheld ... for the law enforcement purpose of solving crimes," (id. at p. 506, 120 Cal.Rptr.2d 197) and even inmates under a sentence of death are capable of committing crime. (Id., at pp. 506-507, 120 Cal.Rptr.2d 197.)
The court in Alfaro also confronted the plaintiffs' claim that existing state and federal authority was not dispositive in resolving their challenge based upon the right to privacy, which in California is an express constitutional right broader and more protective in many respects "than the right to privacy implied in the federal Constitution." (Alfaro, supra, 98 Cal.App.4th 492, 508, 120 Cal.Rptr.2d 197.) The court concluded: "Although California courts applying state constitutional principles are not required to reach the same conclusion as courts of other jurisdictions, in this instance we agree with the trial court that the balancing process does not support a result contrary to the results reached in every other jurisdiction to have considered the matter. In this respect, we note that the balancing test was applied in People v. King, supra, 82 Cal.App.4th at pages 1377 and 1378 [99 Cal.Rptr.2d 220], a California Court of Appeal decision upholding former section 290.2." (Id., at p. 509, 120 Cal. Rptr.2d 197.)
King was again approved and found dispositive in Adams, where the defendant argued that the trial court erred by admitting *190 evidence of "DNA-typing evidence raising the issue that the forced extraction of blood violates a person's `most personal and deep-rooted expectations of privacy.' [Citation.]" (Adams, supra, 115 Cal. App.4th 243, 255, 9 Cal.Rptr.3d 170.) In support of his claim that the "extraction of a prisoner's blood" requires "reasonable suspicion or a warrant," the defendant in Adams asserted "there is no `special need' for the program beyond general law enforcement purposes," citing the United States Supreme Court cases of Ferguson v. Charleston (2001) 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (Ferguson), and Indianapolis v. Edmond (2000) 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (Edmond),[6] and asserted that more efficient law enforcement "`"can never by itself justify disregard of the Fourth Amendment." [Citation.]'" (Adams, supra, at pp. 256-257, 9 Cal.Rptr.3d 170, italics added.) The court commented that the DNA collection statutes have been consistently upheld in both the federal and various state courts on either one of two theories: the "balancing test" articulated in King and other cases (id. at p. 255, 9 Cal. Rptr.3d 170), or the "`special needs' doctrine." (Adams, supra, at p. 256, 9 Cal. Rptr.3d 170; see also Johnson v. Quander (D.C.Cir.2006) 440 F.3d 489; Nicholas v. Goord (2d Cir.2005) 430 F.3d 652, 666-672; United States v. Sczubelek, supra, 402 F.3d 175, 184-187; Padgett v. Donald, supra, 401 F.3d 1273, 1277-1282; United States v. Kincade (9th Cir.2004) 379 F.3d 813, 830-832; Green v. Berge (7th Cir. 2004) 354 F.3d 675, 676-679 (upholding the Wisconsin DNA statute); Groceman v. United States (5th Cir.2004) 354 F.3d 411; United States v. Kimler (10th Cir.2003) 335 F.3d 1132; Roe v. Marcotte, supra, 193 F.3d 72 (upholding the Connecticut DNA statute); Boling v. Romer, supra, 101 F.3d 1336; Rise v. State of Oregon, supra, 59 F.3d 1556, 1562; Jones v. Murray, supra, 962 F.2d 302, 305-311 (upholding the Virginia DNA statute); Miller v. United States Parole Comm'n (D.Kan. 2003) 259 F.Supp.2d 1166, 1175-1178; *191 Johnson v. Commonwealth (2000) 259 Va. 654, 671-673, 529 S.E.2d 769; Doles v. State (Wyo.1999) 994 P.2d 315, 316-320.)[7]
As in King, the court in Adams adhered to the balancing test, without the need to "identify a `"special needs" beyond the normal need for law enforcement,'" based primarily upon the factor that "the class of persons subject to the Act is convicted criminals, not the general population," and "convicted criminals do not enjoy the same expectation of privacy that nonconvicts do." (Adams, supra, 115 Cal.App.4th 243, 258, 9 Cal.Rptr.3d 170.) Quoting from King, the court then concluded: "The individuals who are required to give samples have been found guilty beyond a reasonable doubt of serious crimes such as murder, manslaughter, sexual offenses, assaults, and kidnapping (§ 296, subd. (a)(1)), either by a trier of fact or by their own admission. One result of their crimes is that society has a vastly increased interest in their identities. `The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as "legitimate." [Citation.]' [Citation.] `By their commissions of a crime and subsequent convictions, persons such as appellant have forfeited any legitimate expectation of privacy in their identities. In short, any argument that Fourth Amendment privacy interests do not prohibit gathering information concerning identity from the person of one who has been convicted of a serious crime, or of retaining that information for crime enforcement purposes, is an argument that long ago was resolved in favor of the government.' (King, supra, 82 Cal.App.4th at p. 1375 [99 Cal.Rptr.2d 220], fn. omitted.) The trial court did not err in refusing to suppress the DNA profile evidence." (Id., at p. 259, 9 Cal.Rptr.3d 170.)
Defendant maintains that the amendment of section 296, subdivision (a)(1), to include mandatory collection of DNA samples for convictions of any felony offenses, rather than specified violent or serious felonies, alters the Fourth Amendment balancing equation in "favor of protecting [his] Fourth Amendment rights." He claims that collection of DNA evidence for offenses that "involved neither violence, nor bodily contact with others," such as his driving under the influence conviction, is unlikely to result in a match with "similar crimes in the past or future," and thus "will not further the government's interest in crime detection and prevention." Defendant points out that in King we expressed the caveat: "We, however, are not concerned with whether the state legitimately can require all such persons to provide samples, or whether persons who are not incarcerated may be required to provide samples or replace samples taken while they were in a penal institution. We *192 determine only whether one such as appellant, imprisoned for having committed a crime involving a sexual assault, might be required to provide samples of blood and saliva for DNA analysis in accordance with the procedures outlined in Penal Code former section 290.2." (King, supra, 82 Cal. App.4th 1363, 1370, 99 Cal.Rptr.2d 220.)
While Proposition 69 did indeed expand the scope of section 296, subdivision (a)(1), to require collection of DNA samples for any felony conviction (Coffey v. Superior Court, supra, 129 Cal.App.4th 809, 814, 29 Cal.Rptr.3d 59), we are not persuaded that the governmental interest furthered by the statute is thereby diminished to an extent that it offends Fourth Amendment principles under the balancing test. The legitimate governmental interest in maintaining a permanent, reliable record of identification of all convicted felons remains unassailable under the current version of section 296, subdivision (a)(1), and "outweighs the minor intrusion involved" in taking prisoners' saliva or blood samples "and storing their DNA profiles, given prisoners' reduced expectation of privacy in their identities...." (Padgett v. Donald, supra, 401 F.3d 1273, 1280; see also Green v. Berge, supra, 354 F.3d 675, 678; Jones v. Murray, supra, 962 F.2d 302, 308.) Although DNA testing may serve a more vital interest when administered to felons convicted of violent offenses, the utility of precise identification of all felons continues to justify the search, particularly where, as here, the intrusion is minor in nature and the expectation of privacy is minimal.[8] (Jones v. Murray, supra, at p. 308.) As with the more limited DNA collection statutes, the courts have uniformly found laws that include all felonies as qualifying offenses to comply with the Fourth Amendment. (See Green v. Berge, supra, 354 F.3d 675, 679; Jones v. Murray, supra, at p. 308; Johnson v. Commonwealth, supra, 259 Va. 654, 671-673, 529 S.E.2d 769; Doles v. State, supra, 994 P.2d 315, 319-320.) We agree with the reasoning in Adams, Alfaro, and King, and decline to depart from the overwhelming weight of authority in this state and other jurisdictions that has given universal approval to DNA collection statutes. We conclude that the trial court's order did not violate defendant's Fourth Amendment or privacy rights.

III. Section 296 as a Violation of Equal Protection Rights.
Next, defendant argues that section 296.1 violates the equal protection rights of convicted felons. He claims that the "involuntary extraction" of DNA samples from all those convicted of felonies creates an "overly inclusive classification" which infringes upon the "fundamental right of privacy" without a compelling state interest.
The constitutional guarantees of equal protection as embodied in the Fourteenth Amendment of the United States Constitution and article I, section 7 of the California Constitution "`"prohibit the state from arbitrarily discriminating among persons subject to its jurisdiction."' [Citation.] `[This guarantee] has been defined to mean that all persons under similar circumstances are given "`equal protection and security in the enjoyment of personal and civil rights . . . and the prevention and redress of wrongs. . . .'" [Citation.] The concept "`"compels recognition of the proposition *193 that persons similarly situated with respect to the legitimate purpose of the law receive like treatment."'" [Citation.]' [Citation.] `"Under the equal protection clause, `[a] classification "must be reasonable, not arbitrary, and must rest upon some grounds of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."'" [Citations.]' [Citation.]" (People v. Rhodes (2005) 126 Cal.App.4th 1374, 1382-1383, 24 Cal.Rptr.3d 834.)
"`The equality guaranteed by the equal protection clauses of the federal and state Constitutions is equality under the same conditions, and among persons similarly situated....' [Citation.]" (People v. Spears (1995) 40 Cal.App.4th 1683, 1687, 48 Cal.Rptr.2d 634.) "`"[N]either the Fourteenth Amendment of the Constitution of the United States nor the California Constitution [citations] precludes classification by the Legislature or requires uniform operation of the law with respect to persons who are different." [Citation.] Thus, ... a threshold requirement of any meritorious equal protection claim "is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. [Citation.]" [Citation.] "This initial inquiry is not whether persons are similarly situated for all purposes, but `whether they are similarly situated for purposes of the law challenged.' [Citation.]" [Citation.]' [Citation.]" (People v. Love (2005) 132 Cal.App.4th 276, 287, 34 Cal.Rptr.3d 6; People v. Hofsheier (2006) 37 Cal.4th 1185, 1198, 39 Cal.Rptr.3d 821, 129 P.3d 29; People v. Dial (2004) 123 Cal.App.4th 1116, 1119-1120, 20 Cal.Rptr.3d 573; see also People v. Calhoun (2004) 118 Cal.App.4th 519, 529, 13 Cal.Rptr.3d 166.)
"`The use of the term "similarly situated" in this context refers only to the fact that "`[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' . . ." [Citation.] There is always some difference between the two groups which a law treats in an unequal manner since an equal protection claim necessarily asserts that the law in some way distinguishes between the two groups....' [Citation.]" (People v. Jones (2002) 101 Cal.App.4th 220, 227, 124 Cal. Rptr.2d 10, overruled on other grounds in People v. Hofsheier, supra, 37 Cal.4th 1185,1192, 39 Cal.Rptr.3d 821, 129 P.3d 29; see also People v. Goslar (1999) 70 Cal. App.4th 270, 276-277, 82 Cal.Rptr.2d 558.) "The analysis will not proceed beyond this stage if the groups at issue are not `"similarly situated with respect to the legitimate purpose of the law,"' or if they are similarly situated, but receive `"like treatment."' Identical treatment is not required. [Citations.]" (In re Jose Z. (2004) 116 Cal.App.4th 953, 960, 10 Cal.Rptr.3d 842.) "`The "similarly situated" prerequisite simply means that an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified.' [Citation.] `Persons who are similarly situated must be treated alike. [Citation.] There is, however, no requirement that persons in different circumstances must be treated as if their situations were similar.' [Citation.]" (People v. Rhodes, supra, 126 Cal. App.4th 1374, 1383, 24 Cal.Rptr.3d 834.)
We find that defendant has failed to demonstrate that two similarly situated groups have been treated in an unequal manner by the DNA sample collection laws. Instead of directing us to a classification between similarly situated groups, *194 defendant has merely asserted that section 296.1, as it "now applies to all felonies," has an "overly broad reach" that infringes upon his right to privacy. But the statute treats all persons convicted of felonies the same. The distinction created by section 296.1 is between all felony offenders, who must provide a DNA sample, and everyone else, including those convicted of misdemeanors, who do not. Thus, defendant received the same treatment accorded to all persons in California who are convicted of a felony. (See People v. Rhodes, supra, 126 Cal.App.4th 1374, 1386, 24 Cal.Rptr.3d 834.) We find that at least with respect to the purpose of collecting DNA samples to identify convicted felons, solve crimes, and deter future criminal behavior, felony offenders and others, even misdemeanants, are not similarly situated. (People v. Erdelen (1996) 46 Cal.App.4th 86, 93, 53 Cal. Rptr.2d 553; People v. Hibbard (1991) 231 Cal.App.3d 145, 148-149, 282 Cal.Rptr. 351; In re Valenti (1986) 178 Cal.App.3d 470, 474-475, 224 Cal.Rptr. 10.) "`A felon is uniquely burdened by a diverse collection of statutorily imposed disabilities long after his release from prison.' [Citations.][ ] On the other hand, when misdemeanants conclude their sentences there is no further obligation nor loss of civil rights. [Citation.] Further, the state has a compelling interest to protect its law-abiding citizens by discouraging the criminal element from repeatedly violating its laws." (People v. Hibbard, supra, at p. 149, 282 Cal.Rptr. 351, fn. omitted; see also People v. Murray (1994) 23 Cal. App.4th 1783, 1791, 29 Cal.Rptr.2d 42; Sovereign v. People (1983) 144 Cal.App.3d 143, 148, 192 Cal.Rptr. 469.)
The comparative gravity of distinctive criminal offenses and the commensurate action to be taken to address them is also not an assessment either defendant or this court is entitled to undertake. (People v. Rhodes, supra, 126 Cal.App.4th 1374, 1385, 24 Cal.Rptr.3d 834.) The matter of delineating the elements of crimes and prescribing the consequences of convictions for various offenses is distinctly and solely a legislative function. (See People v. Malfavon (2002) 102 Cal.App.4th 727, 738, 125 Cal.Rptr.2d 618; People v. Ruiz (1996) 44 Cal.App.4th 1653, 1662, 52 Cal.Rptr.2d 561; People v. Superior Court (Perez) (1995) 38 Cal.App.4th 347, 361, 45 Cal.Rptr.2d 107; People v. Flores (1986) 178 Cal.App.3d 74, 85, 223 Cal.Rptr. 465.) "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think." (Williamson v. Lee Optical Inc. (1955) 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563; Kasler v. Lockyer (2000) 23 Cal.4th 472, 482, 97 Cal.Rptr.2d 334, 2 P.3d 581.) "`"[S]ubject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch." [Citations.]' [Citation.]" (Manduley v. Superior Court (2002) 27 Cal.4th 537, 552, 117 Cal.Rptr.2d 168, 41 P.3d 3; see also People v. Ingram (1995) 40 Cal.App.4th 1397, 1412-1413, 48 Cal.Rptr.2d 256; People v. Thompson (1994) 24 Cal.App.4th 299, 304, 29 Cal. Rptr.2d 847.)
We therefore conclude that the trial court did not violate defendant's equal protection rights by ordering him to submit to DNA testing pursuant to section 296.1.

IV. Section 296 as a Violation of Due Process Rights.
Defendant makes a rather cursory argument that section 296 as applied to his "DUI conviction," which "did not involve bodily contact," violated his due process rights. He maintains that the statute in its current overbroad form "constitutes an *195 unreasonable and arbitrary extension" of the DNA sample collection law.
We conclude that section 296 does not offend substantive due process principles. "`Generally, the constitutional guaranty of substantive due process protects against arbitrary legislative action; it requires legislation not to be "unreasonable, arbitrary or capricious" but to have "a real and substantial relation to the object sought to be attained." [Citation.] Thus, legislation does not violate substantive due process so long as it reasonably relates "to a proper legislative goal." [Citations.]' [Citation.]" (People v. Mitchell (1994) 30 Cal.App.4th 783, 798, 36 Cal. Rptr.2d 150.) Due to the inherently subjective factors that define substantive due process rights and the lack of precise "`guideposts for responsible decisionmaking in this unchartered area,'" courts are reluctant to expand the concept of substantive due process and "therefore `exercise the utmost care whenever we are asked to break new ground in this field.'" (Washington v. Glucksberg (1997) 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772; see also Jimenez v. County of Los Angeles (2005) 130 Cal.App.4th 133, 141, 29 Cal. Rptr.3d 553.) Even as amended to include all felony offenders within the DNA testing requirement, we are persuaded that the statute is minimally intrusive, does not infringe upon privacy rights that are recognized as reasonable, and serves a compelling state interest. (Johnson v. Commonwealth, supra, 259 Va. 654, 672-673, 529 S.E.2d 769.) The extraction and collection of DNA samples in accordance with medically accepted procedures for inclusion within a state DNA database program "does not implicate the Due Process Clause." (Rise v. State of Oregon, supra, 59 F.3d 1556, 1562-1563; see also Schmerber v. California, supra, 384 U.S. 757, 759-760, 86 S.Ct. 1826, 16 L.Ed.2d 908; Boling v. Romer, supra, 101 F.3d 1336; Groceman v. United States Dep't of Justice (U.S. Dist. Ct., N.D.Tex., June 26, 2002, Civ. A. No. 301CV1619G) 2002 WL 1398559; United States v. Hook (N.D. Ill., Jan. 20, 2006, No. 04 CR 1045) 2006 U.S.Dist. Lexis 2386.)

V. The Claim of an Ex Post Facto Violation.
Defendant finally contends that the trial court's order inflicted "additional punishment" upon him that was "not in effect at the time of his offense," and thus violated the proscription against ex post facto laws. Defendant points out that his driving under the influence offense occurred on November 4, 2001, while the amendment of section 296.1 to include all felony offenses was not effective until November 2, 2004. He claims that the "nonconsensual extraction of DNA samples" from him pursuant to section 296.1 "increased his punishment in violation of the Ex Post Facto Clause."
"[T]he ex post facto clauses of the state and federal Constitutions [offer protection from] `laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts."' [Citations.]" (People v. Grant (1999) 20 Cal.4th 150, 158, 83 Cal.Rptr.2d 295, 973 P.2d 72.)[9] "`An ex post facto law is a retrospective statute applying to crimes committed before its enactment, and substantially injuring the accused....' [Citation.] If a crime *196 is committed before the `effective date' of a statute and the statute retroactively increases the punishment for the crime or eliminates a defense, the statute violates the ex post facto clauses." (People v. Jenkins (1995) 35 Cal.App.4th 669, 672, 41 Cal.Rptr.2d 502.)
A defendant's loss of certain protections or the imposition of certain disadvantages after the commission of a crime, does not necessarily result in an ex post facto violation. (People v. Ansell (2001) 25 Cal.4th 868, 884, 108 Cal.Rptr.2d 145, 24 P.3d 1174.) "The ex post facto clause does not prohibit all increased burdens; it only prohibits more burdensome punishment." (People v. Acuna (2000) 77 Cal.App.4th 1056, 1059, 92 Cal.Rptr.2d 224.) "[W]hether a retroactive criminal statute is deemed procedural or substantive, it contravenes the ex post facto clause only if it redefines criminal conduct or aggravates punishment." (People v. Frazer (1999) 21 Cal.4th 737, 757, 88 Cal. Rptr.2d 312, 982 P.2d 180, citing Collins v. Youngblood (1990) 497 U.S. 37, 45-46, 110 S.Ct. 2715, 111 L.Ed.2d 30; accord, People v. Mesce (1997) 52 Cal.App.4th 618, 622, 60 Cal.Rptr.2d 745.)
"If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is `"so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil."' [Citation.] Because we `ordinarily defer to the legislature's stated intent,' [citation], `"only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty,' [citations]." (Smith v. Doe (2003) 538 U.S. 84, 92, 123 S.Ct. 1140, 155 L.Ed.2d 164; see also People v. Castellanos, supra, 21 Cal.4th 785, 802, 88 Cal.Rptr.2d 346, 982 P.2d 211.)
The imposition of a DNA testing requirement under section 296.1 for felony convictions may constitute a disadvantage or burden, but the statute was neither intended to nor does inflict punishment for commission of the crime. A statute is considered "`nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.' [Citation and fn. omitted.]" (People v. McVickers (1992) 4 Cal.4th 81, 86, 13 Cal.Rptr.2d 850, 840 P.2d 955.) Examination of the DNA sample collection law reveals that it was not enacted to punish convicted felons, but instead to establish a DNA database to assist in the identification, arrest, and prosecution of criminals. (Shaffer v. Saffle (10th Cir.1998) 148 F.3d 1180, 1181; Rise v. State of Oregon, supra, 59 F.3d 1556, 1562; Gilbert v. Peters (7th Cir.1995) 55 F.3d 237, 238-239; Ewell v. Murray (4th Cir.1993) 11 F.3d 482, 486; Turner v. Carpenter (9th Cir.2003) 63 Fed. Appx. 318, 319, 2003 WL 1878794; United States v. Hook, supra, 2006 U.S.Dist. Lexis 2386, 21-22; see generally Annot., Validity, Construction, and Operation of State DNA Database Statutes, supra, 76 A.L.R.5th 239 at § 2; H.R.Rep. No. 106-900(I), 2000 WL 1420163 at pp. 13-14; 146 Cong.Rec. S11647, 2000 WL 1784925 at p. 4.) In Jones v. Murray, supra, 962 F.2d 302, 309, the court held that legislation requiring prisoners to donate blood samples for a DNA data bank did not violate the ex post facto clause as applied to prisoners who had committed their crimes before the legislation's effective date. The "court reasoned that `"[T]he requirement that prisoners provide blood samples is not punitive in nature. . . . The blood sample is taken and analyzed for the sole purpose of establishing a data bank which will aid future law enforcement."'" (McVickers, *197 supra, at p. 86, 13 Cal.Rptr.2d 850, 840 P.2d 955.) We conclude that subjecting a defendant to DNA testing is not punishment, and therefore the trial court's order is not invalid as an ex post facto application of section 296.1. (See People v. Adames (1997) 54 Cal.App.4th 198, 214, 62 Cal.Rptr.2d 631.)[10]

DISPOSITION
Accordingly, the judgment is affirmed.
We concur: MARCHIANO, P.J., and MARGULIES, J.
NOTES
[1] In light of defendant's plea, our recitation of the evidence will be limited to the facts necessary to resolve the claims of error associated with imposition of his sentence.
[2] The remaining charges against defendant were dismissed in accordance with the plea agreement.
[3] All further statutory references are to the Penal Code unless otherwise indicated.
[4] Section 296, subdivision (a)(1), reads in full: "(a) The following persons shall provide buccal swab samples, right thumbprints, and a full palm print impression of each hand, and any blood specimens or other biological samples required pursuant to this chapter for law enforcement identification analysis:

(1) Any person, including any juvenile, who is convicted of or pleads guilty or no contest to any felony offense, or is found not guilty by reason of insanity of any felony offense, or any juvenile who is adjudicated under Section 602 of the Welfare and Institutions Code for committing any felony offense."
[5] Section 296.1, subdivision (a)(2)(A)(i), reads: "(a) The specimens, samples, and print impressions required by this chapter shall be collected from persons described in subdivision (a) of Section 296 for present and past qualifying offenses of record as follows: [¶] (2) Collection from persons confined or in custody after conviction or adjudication: [¶] (A) Any person, including any juvenile who is imprisoned or confined or placed in a state correctional institution, a county jail, a facility within the jurisdiction of the Department of the Youth Authority, the Board of Corrections, a residential treatment program, or any state, local, city, private, or other facility after a conviction of any felony or misdemeanor offense, or any adjudication or disposition rendered in the case of a juvenile, whether or not that crime or offense is one set forth in subdivision (a) of Section 296, shall provide buccal swab samples and thumb and palm print impressions and any blood or other specimens required pursuant to this chapter, immediately at intake, or during the prison reception center process, or as soon as administratively practicable at the appropriate custodial or receiving institution or placed in program if: [¶] (i) The person has a record of any past or present conviction or adjudication as a ward of the court in California of a qualifying offense described in subdivision (a) of Section 296 or has a record of any past or present conviction or adjudication in any other court, including any state, federal, or military court, of any offense that, if committed or attempted in this state, would have been punishable as an offense described in subdivision (a) of Section 296...."
[6] In Edmond, defendant challenged a highway checkpoint employed by law enforcement in Indianapolis, the primary purpose of which was to identify persons transporting drugs. Under the program, police would stop vehicles momentarily, ostensibly to ask the driver for license and registration. During the stop, a dog trained to locate drugs would check the car from the outside. (Edmond, supra, 531 U.S. 32, 35, 121 S.Ct. 447, 148 L.Ed.2d 333.) The court found a "difference in the Fourth Amendment significance of highway safety interests and the general interest in crime control." (Id. at p. 40, 121 S.Ct. 447.) The court stated the primary purpose of the Indianapolis checkpoint program was interdicting drugs, even though it also had the effect of reducing the number of unsafe drivers. (Id. at pp. 41-42, 121 S.Ct. 447.) Since the program's primary purpose was general crime control, individual suspicion was required, notwithstanding the secondary effect. (Id. at pp. 46-47, 121 S.Ct. 447.)

Ferguson, supra, 532 U.S. at pages 72-73, 121 S.Ct. 1281 involved a challenge to a program which allowed hospitals to screen maternity patients' urine samples for drugs if the patient met criteria suggesting possible drug use. Where evidence of drugs was found, it was given to police if the patient refused drug treatment. The court found that the "central and indispensable feature of the policy" was the use of law enforcement to coerce treatment. (Id. at p. 80, 121 S.Ct. 1281.) The court "carried out a `close review' of the scheme" to determine the program's primary purpose. (Id. at p. 81, 121 S.Ct. 1281.) Because the primary purpose was "to generate evidence for law enforcement purposes," the "case simply does not fit within the closely guarded category of `special needs.'" (Id. at pp. 83, 84, 121 S.Ct. 1281.)
"Ferguson and Edmond struck down suspicionless searches because they vindicated no special need distinguishable from general law enforcement. However, the searches they discussed were performed on free persons, not incarcerated felons." (Padgett v. Donald, supra, 401 F.3d 1273, 1279.)
[7] The special needs doctrine is an exception "to the usual warrant and probable-cause requirements ... where `special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" (Nicholas v. Goord, supra, 430 F.3d 652, 660.) "Such searches, which have historically been treated as a `closely guarded category,' Chandler v. Miller, 520 U.S. 305, 309, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), have been upheld only in limited circumstances, including searches conducted at the border, in prisons, and at airports and entrances to government buildings; administrative or regulatory searches, particularly of closely regulated businesses; student and employee drug tests; information-seeking checkpoints; and searches of probationers' residences. See also Kincade, 379 F.3d at 822-23 (describing categories of suspicionless searches)." (Id., at pp. 660-661, fns. omitted.) "What unifies these cases, despite their varied contexts, is that in each instance, the Court found that the suspicionless-search regime at issue served some special need distinct from normal law-enforcement needs." (Id., at p. 661.)
[8] We deny defendant's motion to take or admit additional evidence, and will not consider any statistical evidence of recidivism rates. We need not resort to statistical substantiation to conform the commonly acknowledged assumption cited in many cases that the recidivism rates of convicted felons are high.
[9] "Article I, section 10, clause 1 of the federal Constitution states in pertinent part: `No state shall ... pass any ... ex post facto law....' Article I, section 9 of the California Constitution similarly states that an `ex post facto law ... may not be passed.' The California provision is analyzed in the same manner as its federal counterpart." (People v. Castellanos (1999) 21 Cal.4th 785, 790, 88 Cal.Rptr.2d 346, 982 P.2d 211.)
[10] In People v. Adames, supra, 54 Cal.App.4th 198, 214, 62 Cal.Rptr.2d 631, the court held that "section 3 does not bar application of the AIDS testing mandate to appellant" pursuant to subdivision (e)(6) of section 1202.1, "although section 288 was not listed as an offense for which such testing was required when he committed the offense (§ 288.5) for which he was convicted." The court concluded that "subjecting a defendant to AIDS testing is not punishment. It is therefore clear that no increase in punishment occurs by requiring appellant to submit to AIDS testing although, when committed, his offense was not one which triggered the AIDS testing requirement. Accordingly, the subject AIDS testing order is not invalid as a retroactive application of section 1202.1." (Adames, supra, at p. 214, 62 Cal.Rptr.2d 631.)